UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JENNIFER SONG and SCOTT WERTKIN,       Case No. 18-CV-3205 (PJS/KMM)
on behalf of themselves and all others
similarly situated,

         Plaintiffs,

v.                               ORDER

CHAMPION PETFOODS USA, INC. and
CHAMPION PETFOODS LP,

         Defendants.

---

Raina Borrelli, Daniel E. Gustafson, and Karla M. Gluek, GUSTAFSON
GLUEK PLLC; Daryl DeValerio Andrews, ANDREWS DEVALERIO;
Kenneth A. Wexler, Mark Tamblyn, and Michelle Perkovic, WEXLER
WALLACE LLP; Kevin A. Seely and Steven M. McKany, ROBBINS LLP;
and Rebecca A. Peterson and Robert K. Shelquist, LOCKRIDGE
GRINDAL NAUEN PLLP, for plaintiffs.

David A. Coulson, Elisa H. Baca, Jared R. Kessler, Ricky L. Shackelford,
and Robert S. Galbo, GREENBERG TRAURIG, P.A.; and Blake Shepard,
Jr. and William C. Penwell, SIEGEL BRILL, P.A., for defendants.

Plaintiffs Jennifer Song and Scott Wertkin are dog owners who allege that they

were misled by claims made on packages of dog food manufactured and distributed by

defendants Champion Petfoods USA, Inc. and Champion Petfoods LP (collectively,

"Champion").  Plaintiffs bring a wide array of fraud-based claims against Champion.

This matter is before the Court on Champion's motion to dismiss.  For the reasons that

follow, the motion is granted, and the second amended complaint is dismissed.

## I. BACKGROUND

This lawsuit is one of numerous fraud actions brought against Champion by pet owners who paid high prices for what they believed to be premium pet food and who now allege that the pet food they purchased did not live up to various promises that appeared on the pet food's packaging.[1]  Song and Wertkin began purchasing Acana and Orijen dog food—two varieties of dry kibble manufactured by Champion—in November 2016 and October 2013, respectively.  Both Song and Wertkin stopped purchasing the dog food in February 2018.  Second Am. Compl. ("SAC") ¶¶ 7–8.

According to plaintiffs, Champion charges "one of the highest, if not the highest, price premiums in the market for their dog foods."  SAC ¶ 43.  Plaintiffs claim that they

---

[1]*See Shaker v. Champion Petfoods USA Inc.*, No. 18-13603, 2020 WL 6887449 (E.D. Mich. Nov. 24, 2020); *Renfro v. Champion Petfoods USA, Inc.*, No. 18-CV-2756-DDD-MEH, 2020 WL 4433027 (D. Colo. July 31, 2020); *Rydman v. Champion Petfoods USA, Inc.*, No. C18-1578 RSM, 2020 WL 4347512 (W.D. Wash. July 29, 2020); *Colangelo v. Champion Petfoods USA, Inc.*, No. 6:18-CV-1228 (LEK/ML), 2020 WL 777462 (N.D.N.Y. Feb. 18, 2020); *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS-JPS, 2019 WL 7370374 (E.D. Wis. Dec. 31, 2019); *Cesare v. Champion Petfoods USA Inc.*, 429 F. Supp. 3d 55 (W.D. Pa. 2019); *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2019 WL 3555383 (N.D. Ill. July 30, 2019); *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952 (E.D. Ky. 2019); *Vado v. Champion Petfoods USA, Inc.*, No. 18-CV-7118-JCS, 2019 WL 634644 (N.D. Cal. Feb. 14, 2019); *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597 (E.D. Wis. 2019);  *Leppert v. Champion Petfoods USA Inc.*, No. 18 C 4347, 2019 WL 216616 (N.D. Ill. Jan. 16, 2019); *Ficarelli v. Champion Petfoods USA, Inc.*, No. 3:18-CV-0361, 2018 WL 6832075 (M.D. Tenn. Dec. 28, 2018); *Reitman v. Champion Petfoods USA, Inc.*, No. CV 18-1736-DOC (JPRx), 2018 WL 4945645 (C.D. Cal. Oct. 10, 2018); *Blackburn v. Champion Petfoods USA, Inc.*, No. 1:18-CV-0038 (S.D. Iowa); *Slawsby v. Champion Petfoods USA, Inc.*, No. 1:18-CV-10701-GAO (D. Mass.); *Hodge v. Champion Petfoods USA Inc.*, No. 1:18-CV-0248-TSB (S.D. Ohio).

purchased Champion's dog food rather than cheaper alternatives in reliance on the representations made by Champion on its packaging. Specifically, plaintiffs allege that they relied on the following four statements: (1) "Biologically Appropriate," (2) "Fresh Regional Ingredients," (3) "Nourish as Nature Intended," and (4) "Delivering Nutrients Naturally."[2] SAC ¶ 2. Plaintiffs allege that each of these statements is false or misleading because, unbeknownst to plaintiffs, the dog food contained or had a risk of containing heavy metals, Bisphenol A ("BPA"), pentobarbital, and non-fresh, non-regional ingredients.

To be clear: Plaintiffs do not allege that their dogs were harmed in any way by the dog food. Rather, plaintiffs assert that *they* were harmed because they paid a high price for what they were falsely led to believe was premium dog food—dog food that they would not have purchased (especially at such a high price) had they known of its true nature and quality.[3] *See* SAC ¶ 13.

---

[2]"Nourish as nature intended" appears on Orijen dog-food packaging, and "delivering nutrients naturally" appears on Acana dog-food packaging. The remaining statements appear on both Orijen and Acana packaging. SAC ¶ 188.

[3]In its briefing, Champion argues that plaintiffs lack standing because there is no allegation that plaintiffs' dogs were actually harmed by the dog food. As Champion acknowledged at oral argument, however, the harm that plaintiffs allege is not physical harm to the dogs, but economic harm to the dog owners. This harm is adequately alleged for standing purposes. *See, e.g.*, *Laughlin v. Target Corp.*, No. 12-CV-0489 (JNE/JSM), 2012 WL 3065551, at *4–5 (D. Minn. July 27, 2012) (finding allegation that plaintiff paid increased price for defendant's shoes and would not have purchased them

(continued...)

The second amended complaint pleads 12 counts, all aimed at establishing Champion's liability for its allegedly false and misleading packaging representations. Plaintiffs allege violations of five Minnesota consumer-protection statutes, negligence per se, breach of express and implied warranties, fraudulent misrepresentation, fraudulent concealment or nondisclosure, and unjust enrichment.[4]

---

[3](...continued) "had she known that the shoes did not provide the advertised benefits" was sufficient to state a cognizable injury); *see also Loeb v. Champion Petfoods USA Inc.*, No. 18-CV-494-JPS, 2018 WL 2745254, at *5 (E.D. Wis. June 7, 2018) (finding that "allegations easily satisfy" standing requirements where plaintiff "pleads that she paid too much for unsafe dog food" because of "Defendants' deceptive and false advertisements").

In support of its standing argument, Champion cites *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014), in which plaintiffs alleged that some packages of hot dogs marketed as "100% kosher" contained non-kosher beef. The Eighth Circuit found that plaintiffs lacked standing because they did not allege "that *all* or even *most* Hebrew National products were not kosher, which means the particular packages of processed beef they purchased may have been—and indeed more than likely were—prepared in accordance with minimum kosher standards." *Id.* at 1030. Here, by contrast, Song and Wertkin have alleged that *all* Champion dog food is deceptively marketed because *all* Champion dog food comes in packages that contain misleading claims. As *Wallace* itself acknowledges, a plaintiff who, like Song and Wertkin, claims to have "paid a premium price for a deceptively marketed product that failed to meet the manufacturer's guarantee" has stated a "concrete, non-speculative injury" sufficient to satisfy standing requirements. *Id.* at 1029; *see also City of Wyoming v. Procter & Gamble Co.*, 210 F. Supp. 3d 1137, 1150–51 (D. Minn. 2016) (distinguishing "breach of warranty and misrepresentation-based case" from *Wallace* for standing purposes).

[4]Plaintiffs agreed to voluntarily dismiss their negligent-misrepresentation claim without prejudice. ECF No. 35.

Champion seeks dismissal of all counts, arguing that plaintiffs have failed to plausibly allege that any of the four challenged packaging claims are false or misleading. Champion also argues that plaintiffs' omission-based claims should be dismissed because Champion was under no legal duty to disclose the presence or risk of presence of heavy metals, BPA, pentobarbital, or non-fresh, non-regional ingredients. The Court largely agrees with Champion and therefore grants its motion to dismiss.

## II.  ANALYSIS

### A.  Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In assessing the sufficiency of the complaint, the Court need not consider legal conclusions that are couched as factual allegations. *Iqbal*, 556 U.S. at 678–79. The Court must, however, accept as true all well-pleaded factual allegations in the complaint and draw all

reasonable inferences in the plaintiffs' favor.  *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).

Claims sounding in fraud are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  Rule 9(b) "requires that a pleading include such matters as the time, place and contents of false representations."  *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010) (citation and quotation marks omitted); *see also Tuttle v. Lorillard Tobacco Co.*, 118 F. Supp. 2d 954, 963 (D. Minn. 2000) (explaining that alleged violations of Minnesota's consumer-fraud statutes must be pled with particularity under Rule 9(b)).  "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."  *Com. Prop. Invs., Inc. v. Quality Inns Int'l*, 61 F.3d 639, 644 (8th Cir. 1995).

Ordinarily if the parties present, and the court considers, matters outside of the pleadings, the motion must be treated as one for summary judgment.  Fed. R. Civ. P. 12(d).  But the Court may consider materials that are embraced by the complaint and matters of public record without converting the motion into one for summary judgment.  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).  In this case, the Court considers photographs of the dog-food packages that are at issue, as well as a chart depicting the levels of heavy metals and BPA in Champion's dog food, both of which are attached to the second amended complaint.  ECF No. 31-1.

B. *Statutory and Common-Law Fraud Claims*

Plaintiffs allege violations of five Minnesota consumer-protection

statutes—specifically, the Minnesota Commercial Feed Law, Minn. Stat. §§ 25.31–.43

("MCFL"); Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.13 ("MUTPA");

Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44 ("MDTPA");

Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67 ("MFSAA"); and

Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69 ("MPCFA")—as

well as common-law claims for fraudulent misrepresentation and fraudulent

concealment.  All seven causes of action require plaintiffs to plausibly allege that, due

either to Champion's affirmative misrepresentations or to Champion's material

omissions, the dog-food packaging "could deceive a reasonable consumer."  *In re 100%*

*Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d 910, 920 (N.D. Ill. 2017)

(discussing "common requirement" of various consumer-protection statutes, including

the MUTPA, MDTPA, MFSAA, and MPCFA); *see also In re Gen. Mills Glyphosate Litig.*,

No. 16-2869 (MJD/BRT), 2017 WL 2983877, at *5–6 (D. Minn. July 12, 2017) (applying

"reasonable consumer" standard to claims under the MUTPA, MDTPA, and MPCFA).

The MPCFA provides a useful starting point, given its relatively straightforward

language and recent Minnesota case law construing it.  The MPCFA prohibits "[t]he act,

use, or employment . . . of any fraud, false pretense, false promise, misrepresentation,

misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby[.]"  Minn. Stat. § 325F.69, subd. 1.  The MPCFA applies to conduct "that tends to deceive or mislead a person," and may be violated by either affirmative misrepresentations or material omissions.  *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014).  Plaintiffs allege that Champion violated the MPCFA both by including false, misleading, and deceptive statements on the dog-food bags, and by failing to disclose the presence of contaminants and non-conforming ingredients.  *See* SAC ¶¶ 302–05.

### 1.  Affirmative Misrepresentations

Plaintiffs allege that Champion violated the MPCFA by falsely representing that its dog foods:  "(a) Are 'Biologically Appropriate'; (b) Contain 'Fresh Regional Ingredients'; (c) 'Nourish as Nature Intended'; and (d) 'Deliver[] Nutrients Naturally.'" SAC ¶ 302.  Plaintiffs argue that these representations are false, misleading, and deceptive because Champion's dog food "contained and/or had a material risk of containing" heavy metals, BPA, pentobarbital, and non-fresh, non-regional ingredients. SAC ¶ 303.

While the question of whether a particular representation is false, misleading, or deceptive "is often a fact question to be determined at a later stage," the Court must

assess the plausibility of all factual allegations in ruling on a motion to dismiss.[5]  *In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *6.  Where allegations of fraud or deception are premised on an implausible interpretation of a packaging statement, dismissal is warranted.[6]  *See id.* (concluding on motion to dismiss that "Made with 100% Natural Whole Grain Oats" could not plausibly be read as a representation that the

---

[5]*See also Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 940 (7th Cir. 2001) (affirming dismissal of statutory consumer-fraud claims upon finding "[a]s a matter of law, none of the three statements on which Bober based his [statutory] claims is deceptive"); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 396 (8th Cir. 1997) (stating, in the context of securities-fraud litigation, that "[w]hether a public statement is misleading is a mixed question normally for the trier of fact," but "[t]he issue is appropriately decided as a matter of law . . . when reasonable minds could not differ"); *Blue Buffalo Co. v. Nestle Purina Petcare Co.*, No. 4:15 CV 384 RWS, 2015 WL 3645262, at *4 (E.D. Mo. June 10, 2015) ("Courts have dismissed false advertising and similar claims when, construing the factual allegations in the light most favorable to the plaintiff, the challenged advertising statements would not plausibly deceive a reasonable consumer.").

[6]*In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d at 913, 919–24 (holding that plaintiffs failed to plausibly allege that "100% Grated Parmesan Cheese" was false or misleading based on the fact that the product contained ingredients other than cheese, including "a nontrivial amount of cellulose," and dismissing claims under consumer-protection statutes including the MUTPA, MDTPA, MFSAA, and MPCFA); *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 759–60 (W.D. Mo. 2015) (finding that plaintiff's definition of "natural" packaging claim as meaning "existing or produced by nature: not artificial" was implausible because chips "are processed foods, which of course do not exist or occur in nature"); *Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 759 (N.D. Ill. 2015) (dismissing complaint because "a reasonable consumer would not conclude" that "no refined sugars" means "only naturally occurring, unrefined sugars"); *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 980 (C.D. Cal. 2013) (dismissing consumer-protection claims because "Plaintiff has failed to allege either a plausible objective definition of the term 'All Natural' or [that] her subjective definition of the term . . . is shared by the reasonable consumer").

product did not contain trace amounts of glyphosate). For the reasons that follow, the Court finds that plaintiffs have not plausibly alleged that any of the four challenged packaging statements "tend[] to deceive or mislead a person," and plaintiffs have therefore failed to state a claim under the MPCFA. *Graphic Commc'ns*, 850 N.W.2d at 695.

### a. *"Biologically Appropriate"*

To determine whether the phrase "biologically appropriate" is false, misleading, or deceptive, the Court must first determine what "biologically appropriate" could reasonably be interpreted to mean. Champion has not argued that "biologically appropriate" is non-actionable puffery; rather, both parties agree that "biologically appropriate" is a factual statement that may be proved or disproved. On its face, "biologically appropriate" suggests little more than that the contents of the bag are fit for consumption by the living organism that will eat them. However, neither party suggests that the phrase should be interpreted according to the words' plain and ordinary meaning.

According to Champion, "biologically appropriate" means that the dog food "mirror[s] the richness, freshness, and variety" of a dog's natural prey, and that the dog food is "protein rich and carbohydrate limited."[7] ECF No. 34 at 16. Plaintiffs' briefing

---

[7]*See also* SAC ¶ 32, acknowledging that "Biologically Appropriate is a
(continued...)

provides multiple, sometimes conflicting definitions of the phrase, but at oral argument plaintiffs finally settled on a position:  According to plaintiffs, "biologically appropriate" means, unless otherwise stated on the packaging, that the dog food is made from all fresh ingredients, does not contain any amount of heavy metals or BPA, and is processed in such a way as to eliminate any risk that it could be contaminated with pentobarbital.  *See* ECF No. 53 at 27:5–10, 28:15–22; 29:5–12; 30:1–16.  This definition attributes an awfully lot to an innocuous, two-word phrase, and the Court finds it implausible that a reasonable consumer would interpret the phrase in this manner.

*First*, as to heavy metals:  A reasonable consumer is highly unlikely to interpret "biologically appropriate" as a guarantee that the dog food contains no heavy metals whatsoever.  The phrase "biologically appropriate" does not, on its face, say anything about heavy metals, except that the dog food does not contain any ingredient (including heavy metals) that would make it unfit for a dog to consume.  Further, plaintiffs do not dispute that heavy metals occur naturally in meat and fish; indeed, plaintiffs plead as much in their second amended complaint.  *See* SAC ¶ 60 ("Arsenic occurs in the environment and can be found in rocks, soil, water, air, plants, and animals.").

---

[7](...continued)
trademarked, objective advertising concept that Defendants intended to communicate to consumers that they designed their Alleged Premium Dog Food to mirror a dog's natural diet."

Plaintiffs also acknowledge—and, in fact, they premise several of their claims on—the fact that Champion's packaging prominently states that its dog food contains significant amounts of meat and fish.  It is simply not plausible to suggest that a reasonable consumer would read the phrase "biologically appropriate" on a dog-food package—a package that makes clear that the dog food contains meat and fish—and understand Champion to be representing that it eliminated all traces of heavy metals from the dog food.  *See Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 972 (E.D. Ky. 2019) (granting motion to dismiss omission-based claim because "[t]he fact that heavy metals naturally exist in organic proteins and in high concentrations in fish belies Plaintiffs' logic that Champion had a duty to disclose this information" (internal citations omitted)); *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019) (finding on motion to dismiss that "the mere presence of heavy metals" did not render packaging claims false or misleading).

Importantly, plaintiffs do not allege that Champion's dog food contains heavy metals in amounts that may harm dogs (that is, in amounts that would be biologically inappropriate).  Rather, plaintiffs argue that the assertion that the dog food is "biologically appropriate"—and the premium price they paid for the dog food—led them to believe that they were buying premium-quality dog food, and premium-quality dog food would not contain even trace amounts of heavy metals.  For the reasons

explained, the Court finds this claim to be implausible.  The Court therefore dismisses
plaintiffs' claim that Champion's representation that its dog food is "biologically
appropriate" is false, misleading, or deceptive because the dog food contains or may
contain a harmless amount of heavy metals.

*Second*, as to BPA:  Plaintiffs allege that "biologically appropriate" is also a
representation that the dog food is BPA-free or that Champion manufactures the dog
food in a way that eliminates any risk of BPA contamination.  As an initial matter,
plaintiffs have not alleged that all bags of Champion dog food have contained BPA; to
the contrary, the testing data attached to plaintiffs' second amended complaint shows
that only some bags have contained BPA.  ECF No. 31-1 at 21–23.  Even if Champion
had falsely represented that *none* of its dog food contained BPA, plaintiffs would not
have been harmed by that misrepresentation unless the dog food that they purchased
contained BPA.  But plaintiffs have not alleged that they personally purchased dog food
that contained BPA.  Plaintiffs therefore lack standing to pursue this claim.  *See Wallace
v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014) (finding that plaintiffs lacked
standing to challenge claim that Hebrew National hot dogs are "100% kosher" because
plaintiffs did not allege "that *all* or even *most* Hebrew National products were not
kosher, which means the particular packages of processed beef they purchased may
have been . . . prepared in accordance with minimum kosher standards").

Recognizing this, plaintiffs challenge Champion's failure to adequately test for and monitor BPA levels at its plant, rather than the presence of BPA in the dog food. Restated, then, plaintiffs' allegation is that a reasonable consumer who read the phrase "biologically appropriate" on a bag of dog food would interpret the phrase not as a representation about the dog food itself, but as a representation about the adequacy of the BPA testing and monitoring protocols used back at the factory.

Plaintiff's allegation about how a reasonable consumer would interpret the phrase "biologically appropriate" is an interpretation contrived by lawyers; it is not an interpretation that would occur to a reasonable consumer as she stood reading a dog-food package in the aisle of a pet-food store.  Whatever it means, the phrase "biologically appropriate" on a bag of Champion dog food is clearly a representation about *the dog food*, and not about the processes followed back at the plant.  "Biologically appropriate" is no more a representation about BPA testing and monitoring protocols than it is a representation about the number of quality-control analysts who work at the plant or the frequency with which the plant's manufacturing equipment is sanitized.[8]

---

[8]It is not clear whether plaintiffs allege that the phrase "biologically appropriate" also means that the dog food was manufactured in a way that removed any risk that the dog food could contain heavy metals.  For the reasons described in the text, the Court finds that any claim that "biologically appropriate" refers to manufacturing processes—as opposed to the dog food itself—is implausible.

One again, plaintiffs' allegation about how a reasonable consumer would interpret the phrase "biologically appropriate" is not plausible. The Court therefore dismisses plaintiffs' claim that Champion's representation that its dog food is "biologically appropriate" is false, misleading, or deceptive because, back at the factory, Champion does not adequately test or monitor for BPA.

*Third*, as to pentobarbital: Here, plaintiffs face a familiar problem, and they attempt to address it in a familiar way. Plaintiffs do not allege that all—or even most—bags of Champion dog food contain pentobarbital, much less that they ever purchased such a bag. Instead, plaintiffs' pentobarbital allegations are based on a 2018 incident at an animal-processing facility from which Champion purchases beef tallow. On May 7, 2018, Champion was notified that it had received a shipment of tallow that had tested positive for pentobarbital. SAC ¶ 168. Neither Song nor Wertkin allege that any bag of dog food that they purchased was contaminated with pentobarbital. Indeed, Wertkin never purchased any variety of dog food that uses beef tallow as an ingredient. SAC ¶¶ 8, 149. Song did purchase these varieties, but specifically alleges that she stopped purchasing Champion dog food in February 2018—several months before Champion was notified of the pentobarbital contamination. *See* SAC ¶ 7.

Once again, then, plaintiffs do not have standing to pursue fraud claims based on an allegation that "biologically appropriate" was a representation that the dog food did

not *contain* pentobarbital.  So plaintiffs instead allege that, when Champion put the words "biologically appropriate" on packages of dog food, it was making yet another representation about its manufacturing process.  This time, the representation is purportedly that the dog food was manufactured in a way that eliminated all risk of even accidental pentobarbital contamination.  Plaintiffs maintain that because Champion was purchasing tallow from the same animal-processing facility at the time that plaintiffs were purchasing dog food from Champion, there was a *risk* that the dog food they purchased was contaminated by pentobarbitral, and that *risk* made Champion's representation that its dog food was "biologically appropriate" false, misleading, or deceptive.

Again, the Court finds that, whatever "biologically appropriate" means, a reasonable consumer who spots that phrase on a package of dog food would interpret it as a representation about the contents of the package (i.e., the dog food), and not about manufacturing processes (i.e., the factory).  *See Colangelo v. Champion Petfoods USA, Inc.*, No. 6:18-CV-1228 (LEK/ML), 2020 WL 777462, at *6 (N.D.N.Y. Feb. 18, 2020) (concluding that "Plaintiffs' pentobarbital allegations cannot serve as the factual basis for any of their claims"); *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2019 WL 3555383, at *5 (N.D. Ill. July 30, 2019) ("Plaintiffs claims about Defendants' dog food containing pentobarbital are merely speculative and cannot give rise to a plausible claim.").  For

that reason, the Court dismisses plaintiffs' claim that Champion's assertion that its dog food is "biologically appropriate" is false, misleading, or deceptive because Champion does not manufacture its dog food in a manner that eliminates all possible risk of pentobarbital contamination.

*Finally*, as to non-fresh or non-regional ingredients:  Plaintiffs have not plausibly alleged that the phrase "biologically appropriate" is deceptive because the dog food contains non-fresh and non-regional ingredients.  It is farfetched to suggest that a reasonable consumer would read this phrase on a bag of dog food as a guarantee that all of the ingredients in the package were fresh and came from a regional source (whatever "regional" might mean).  As anyone who eats can attest, food that is not fresh—and that comes from outside of the consumer's region—can be biologically appropriate.

### b.  Fresh and Regional

Plaintiffs challenge Champion's use of the phrase "Fresh Regional Ingredients" on dog-food packages.  The second amended complaint also cites Champion's statements that "[w]e focus on local ingredients that are . . . delivered to our kitchens fresh or raw each day" and "[w]e focus on fresh ingredients from our region that are ranched, farmed or fished by people we know and trust."  SAC ¶ 50.

After being somewhat unclear in their briefing about their interpretation of the phrase "Fresh Regional Ingredients," plaintiffs clarified their position at oral argument:  Plaintiffs contend that a reasonable consumer would interpret "Fresh Regional Ingredients" to mean that *all* of the ingredients used to make the dog food—100%—were "fresh" and "regional" (unless the package explicitly said otherwise).  *See* ECF No. 53 at 17:5–9; 22:17–23; 37:7–14.  Plaintiffs argue that because this is not true—i.e., because every package of Champion dog food contains at least *some* non-fresh and non-regional ingredients—the phrase "Fresh Regional Ingredients" is deceptive.

Again, the Court finds plaintiffs' proposed definition of a phrase to be implausible.  Just as a statement that mashed potatoes are made with "real butter" does not imply that the *only* fat used is real butter,[9] and just as a statement that graham

---

[9]*See Sarr v. BEF Food, Inc.*, No. 18-CV-6409 (ARR) (RLM), 2020 WL 729883, at *4
(continued...)

crackers are made with "real honey" does not imply that the *only* sweetener used is real honey,[10] so too the statement that a bag of dog food contains "fresh regional ingredients" does not imply that it is composed *exclusively* of ingredients that are fresh and regional.

Moreover, the Champion packages themselves make clear that not all of the ingredients are fresh. On the Orijen Six Fish dog-food packaging, for example, a prominent panel printed in relatively large font explains that "this 13 lb package of Orijen Six Fish is made with over 11 lb of fresh, raw or dried fish ingredients," and that of those 11 pounds, "2/3 [is] fresh or raw" and "1/3 [is] dried." Similarly, the Acana Lamb & Apple Singles Formula packaging explains that "this 13 lb package of Acana is made with 6 1/2 lbs grass-fed lamb ingredients" and further qualifies that "half is fresh or raw . . . and half is dried or oils." ECF No. 31-1 at 10. Thus, the packaging itself makes abundantly clear that the dog food contains a significant amount of non-fresh

---

[9](...continued)
(E.D.N.Y. Feb. 13, 2020) ("[I]t is not plausible that a reasonable consumer would likely interpret the 'real butter' representation to imply that the Mashed Potatoes did not also contain additional fats.").

[10]*See Kennedy v. Mondelēz Glob. LLC*, No. 19-CV-302-ENV-SJB, 2020 WL 4006197, at *12 (E.D.N.Y. July 10, 2020) ("Stating the grahams are 'made with real honey' is a factually true statement about the product" that "does not foreclose the use of other sweeteners" so as to "make the representation deceptive.").

ingredients.[11]  *See Weaver v. Champion Petfoods USA Inc.*, 471 F. Supp. 3d 876, 884

(E.D. Wis. 2020) ("[W]hen the dog food packaging is viewed in full, it is clear that some

ingredients are 'fresh, raw, or dehydrated,' and that some ingredients are frozen and/or

freeze-dried, and that at least several pounds of both types of dog food are not fresh

ingredients.").

Plaintiffs argue that even if a reasonable consumer would understand from the

packaging that the dog food is not made entirely from fresh ingredients, a reasonable

consumer would nonetheless be led to believe that certain *non-fresh* ingredients are

excluded.  Specifically, plaintiffs allege that a reasonable consumer would understand

Champion's use of the word "fresh" to be a representation that it had not used

---

[11]Plaintiffs allege that these panels, referred to as "MeatMath," are "inaccurate" because Champion "consistently used materially less than the advertised amount of meat and fish ingredients[.]"  SAC ¶ 147.  Neither the second amended complaint nor plaintiffs' briefing elaborated on or provided any factual basis for this allegation. Invited to address this omission at oral argument, plaintiffs' counsel confirmed that they had no specific examples of when or how Champion's MeatMath panels were inaccurate.  ECF No. 53 at 31:4–8.  Because "conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy" the heightened pleading requirements of Fed. R. Civ. P. 9(b), the Court finds that plaintiffs' claim about MeatMath must be dismissed.  *Com. Prop. Invs., Inc.*, 61 F.3d at 644.

"regrinds"[12] or expired, frozen, or "refreshed"[13] ingredients.  In other words, plaintiffs argue that a reasonable consumer would interpret a representation that the dog food contains some fresh ingredients as a representation about which *non-fresh* ingredients are (or are not) in the package.

This, too, is not plausible.  Plaintiffs cannot state a claim under the MPCFA by constructing a hypothetical "reasonable consumer" with highly artificial, detailed expectations about a product—in this case, expectations about the use of "regrinds" and "refreshed" ingredients (terms that are unlikely to be familiar to the typical consumer)—and then allege that representations about the product were fraudulent because the product did not meet those expectations.  *Cf. Harris v. Mondelēz Glob. LLC*, No. 19-CV-2249 (ERK) (RER), 2020 WL 4336390, at *3 (E.D.N.Y. July 28, 2020) (dismissing claims based on implausible allegation that a reasonable consumer would expect "Made With Real Cocoa" on Oreo cookie packaging to mean that the cookies were made with cocoa that had not been refined through an alkalization process).

---

[12]Plaintiffs allege that "[r]egrinds is a low quality, non-fresh, and overcooked ingredient" made "from already cooked dog and cat food that had failed nutritional testing, water activity/product temperature testing, and/or microbiological testing," or made "from finished dog and cat food that was too old to sell."  SAC ¶¶ 100–01.

[13]The second amended complaint defines "refreshed" ingredients as ingredients that Champion returned to its suppliers and that the suppliers froze until Champion requested them a second time, at which point the ingredients were thawed.  SAC ¶ 112.

In short, Champion's use of the word "fresh" was not misleading.  Read in the
context of the entire package—which states only that Champion "focused" on fresh
ingredients, and which explicitly discloses that the dog food includes non-fresh
ingredients—the word "fresh" was neither a statement that the dog food was made up
entirely of fresh ingredients, nor a statement about which non-fresh ingredients were
included.  Thus, Champion's use of the word "fresh" was not false, misleading, or
deceptive in violation of the MPCFA.

Plaintiffs make similar arguments with respect to Champion's representation
that it uses "regional" ingredients.  The various bags say, for example, that the dog food
is "made with regional red meats and fish," that the dog food is "regionally inspired,"
or that "we focus on local ingredients that are ethically raised by people we know and
trust . . . ."  *See* ECF No. 31-1 at 2–19.  Plaintiffs define "regional" as meaning within
100 miles of Champion's Kentucky manufacturing plant—a definition that appears to
have been pulled out of thin air.  SAC ¶ 129.  The "regional" statements are false,
misleading, and deceptive, plaintiffs allege, because about 70% of Champion's
ingredients are from "outside of Kentucky, with 25% sourced internationally."  SAC
¶ 130.

Plaintiffs' allegations about "regional" are no more plausible than plaintiffs'
allegations about "fresh."  Champion has not made any statement that a reasonable

consumer would interpret as a representation that every single ingredient that is used to make the dog food—including, for example, saltwater fish such as mackerel and flounder—comes from within 100 miles of Champion's plant in Kentucky. Champion merely represented that *some* of the ingredients came from "regional" sources, and plaintiffs do not challenge the accuracy of that representation. Champion's statements about "regional" ingredients were not false, misleading, or deceptive.

Plaintiffs further allege that even if use of the word "regional" is a not a representation that all of the ingredients used by Champion came from within 100 miles of its plant, it is nevertheless a representation that Champion did not use any ingredients that had been imported from outside of the United States. In other words, plaintiffs argue that a reasonable consumer would interpret a representation that the dog food contains some regional ingredients as a representation about the locations from which *non-regional* ingredients were imported. Plaintiffs' argument is obviously meritless.

### c. "Natural" Claims

Plaintiffs allege that the phrases "nourish as nature intended" and "delivering nutrients naturally" are false or misleading because the dog food contains or has a risk of containing "unnatural" ingredients and contaminants. Champion responds that both

phrases are non-actionable puffery.  Even if these assertions are not puffery, Champion

argues, neither is false or misleading.

"[G]eneral or vague statements about a product's value" that are not susceptible

to proof are considered "puffery," and such statements provide "no legal rights to

buyers." *Anderson v. 1399557 Ontario Ltd.*, No. 18-CV-1672 (PJS/LIB), 2019 WL 5693749,

at *6 (D. Minn. Nov. 4, 2019); *see also Browe v. Evenflo Co.*, No. 14-CV-4690 (ADM/JJK),

2015 WL 3915868, at *5–6 (D. Minn. June 25, 2015) (finding car-seat manufacturer's

representations that the product "makes getting your child in and out a breeze," and

that it is "easy to get your child in and out of the seat" did "not provide the requisite

degree of specificity to make the statement[s] actionable").

 The phrase "nourish as nature intended" is non-actionable puffery—a phrase

that is too vague to be proved or disproved.  As another court considering this same

phrase remarked, "it seems impossible to draw conclusions about what, exactly, 'nature

intends.'" *Zarinebaf*, 2019 WL 3555383, at *7.  Mother Nature cannot be deposed.

The Court finds, however, that the phrase "delivering nutrients naturally" is not

puffery.  Like a representation that a food product is "natural," an assertion that dog

food "deliver[s] nutrients naturally" is reasonably susceptible to proof.

The Court agrees with Champion, however, that plaintiffs have not plausibly

alleged that anything about the phrase "delivering nutrients naturally" is deceptive.

Plaintiffs assert that "the terms 'nutritious,' and 'nourishing' . . . essentially mean containing substances necessary for growth and health or beneficial to health, without artificial aid."  ECF No. 43 at 24.  Plaintiffs also assert that "a reasonable consumer could plausibly rely" on the phrase "delivering nutrients naturally" to mean that "the product either is healthy or, at least, would not harm their health."  *Id.* at 24–25.

The Court agrees that this is a plausible definition of "delivering nutrients naturally."  The problem for plaintiffs is that they have not alleged that Champion's dog food is not healthy, that any dog was harmed by eating it, or that it does not contain "substances necessary for growth and health."  Even as plaintiffs define the phrase, then, "delivering nutrients naturally" is not false, misleading, or deceptive.

Elsewhere in their briefing, plaintiffs propose a different definition of "delivering nutrients naturally":  that it means that the dog food does not contain even trace amounts of BPA or pentobarbital and that the dog food was manufactured via a process that eliminated all risk of BPA or pentobarbital contamination.  Again, though, because plaintiffs have not alleged that they purchased dog food that contained BPA or pentobarbital, they do not have standing to pursue a claim regarding a purported assertion that the dog food was free of BPA and pentobarbital.  And just as "biologically appropriate" cannot reasonably be read as a representation about the process used to manufacture the dog food, so, too, "delivering nutrients naturally" is clearly a

representation about the dog food, and not about the operation of the factory.  *See In re*

*Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *5–6 (packaging claim that product was

"Made With 100% Natural Whole Grain Oats" was not false or misleading because the

product contained trace amounts of glyphosate); *Podpeskar v. Dannon Co.*, No. 16-CV-

8478 (KBF), 2017 WL 6001845 (S.D.N.Y. Dec. 3, 2017) (dismissing claims under MDTPA,

MFSAA, and MPCFA because plaintiff had not plausibly alleged that packaging claim

that yogurt was "natural" was deceptive based on the fact that the yogurt was made

from milk produced by cows that may have been treated with hormones or may have

eaten genetically-modified corn).  The Court therefore finds that plaintiffs have not

plausibly alleged that "delivering nutrients naturally" is false, misleading, or deceptive.

At bottom, plaintiffs' claims depend on their allegation that Champion

represented that its dog food did not contain—and, in fact, was not even at *risk* of

containing—heavy metals, BPA, pentobarbital, non-fresh ingredients, and non-regional

ingredients.  But plaintiffs have not pointed to any statement on the dog-food bags that

can reasonably be interpreted as such a representation by Champion.  Plaintiffs are

understandably perturbed about having paid a premium price for dog food in response

to a skilled marketing campaign, only to find that the dog food did not live up to their

expectations.  But this kind of consumer dissatisfaction with a skillfully touted product

is commonplace.  To state a plausible claim under the MPCFA for an affirmative

misrepresentation, plaintiffs must identify a particular false, misleading, or deceptive statement.  They have failed to do so.

## 2.  Omissions

Plaintiffs also allege that Champion violated the MPCFA through its omissions. SAC ¶ 305.  Under Minnesota law, "for an omission to be actionable, it must be material to the transaction, and the party concealing the fact must have been under a legal or equitable obligation to communicate the fact to the other party."  *Graphic Commc'ns*, 850 N.W.2d at 695 (internal citations omitted).  "[A]n omission-based consumer fraud claim is actionable under the [MPCFA] when special circumstances exist that trigger a legal or equitable duty to disclose the omitted facts.  The [MPCFA] did not eliminate th[is] common law requirement . . . ."  *Id.* at 695–96.

The Minnesota Supreme Court has recognized a duty to disclose material facts in three circumstances: (1) when there is a confidential or fiduciary relationship between the parties; (2) when one party has "special knowledge of material facts to which the other party does not have access"; and (3) when a party's representations would be misleading absent additional disclosures.  *Id.* at 695.

The first and second circumstances do not apply here.  Plaintiffs were not in a confidential or fiduciary relationship with Champion, and Minnesota courts almost never find that one party's "special knowledge" triggers a duty to disclose.  *See id.*

at 697–98 (explaining that the Minnesota Supreme Court has "only applied the special-knowledge theory in one case," in which "a bank that had actual knowledge that one of its depositors was irretrievably insolvent and thus engaging in fraud by entering into a contract with the plaintiff," triggered the bank's "duty to disclose the depositor's insolvency" (citing *Richfield Bank & Tr. Co. v. Sjogren*, 244 N.W.2d 648 (Minn. 1976))). The third circumstance also does not apply. As the Court has explained, none of Champion's packaging statements are deceptive or misleading, and thus none require corrective disclosures. The Court therefore finds that plaintiffs have not plausibly alleged a violation of the MPCFA on the basis of Champion's omissions.[14]

Plaintiffs' remaining statutory and common-law fraud claims fail for the same reason that their MPCFA claims fail. All of these claims require plaintiffs to plausibly allege a false, misleading, or deceptive statement.[15] Plaintiffs have failed to do so.

─────────────

[14]For the same reason, the Court finds that plaintiffs have failed to plausibly allege a common-law claim for fraudulent concealment or nondisclosure.

[15]To state a claim under the MCFL, plaintiffs must plausibly allege that Champion manufactured or distributed "adulterated or misbranded" feed. Minn. Stat. § 25.38(1). Feed is "misbranded" if "its labeling is false or misleading in any particular" or if "its labeling would deceive or mislead the purchaser with respect to its composition or suitability." Minn. Stat. § 25.36. Feed is "adulterated" if "its composition or quality falls below or differs from that which it is purported or is represented to possess by its labeling." Minn. Stat. § 25.37(b)(2). Because plaintiffs have not plausibly alleged that any of the challenged packaging statements are false or misleading, their MCFL claim fails, as does plaintiffs' negligence per se claim, which is premised on Champion's alleged violation of the MCFL. Because the MCFL claim is

(continued...)

-28-

Accordingly, the Court grants Champion's motion to dismiss plaintiffs' statutory and

common-law fraud claims.

### C. Remaining Claims

#### 1. Breach of Express and Implied Warranties

Plaintiffs allege that the four challenged packaging claims—"biologically

appropriate," "fresh regional ingredients," "nourish as nature intended," and

"delivering nutrients naturally"—are express written warranties, and that Champion

---

[15](...continued)
dismissed on this basis, the Court need not reach Champion's alternative argument that
the MCFL does not provide a private right of action, *see* Minn. Stat. § 25.32, or plaintiffs'
responsive arguments that they may circumvent this fact by pleading negligence per se
or by invoking the Minnesota Private Attorney General Statute, Minn. Stat. § 8.31.

Plaintiffs' failure to plausibly allege any false, misleading, or deceptive statement
is also fatal to their claim under the MUTPA (Minn. Stat. § 325D.13) which provides that
"[n]o person shall, in connection with the sale of merchandise, knowingly misrepresent,
directly or indirectly, the true quality, ingredients or origin of such merchandise."
Similarly, the MFSAA (Minn. Stat. § 325F.67) prohibits the making of "any material
assertion, representation, or statement of fact which is untrue, deceptive, or
misleading." And the MDTPA (Minn. Stat. §§ 325D.43–.48) prohibits, among other
things, "represent[ing] that goods or services have . . . characteristics [or] ingredients . . .
that they do not have" or "that goods or services are of a particular standard, quality, or
grade . . . if they are of another." Minn. Stat. § 325D.44, subd. 1(5), (7). The MDTPA
also includes a catch-all provision prohibiting "any other conduct which similarly
creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44,
subd. 1(13). Despite the slightly more expansive language of the catch-all provision, the
Eighth Circuit has described the MDTPA as requiring "false, deceptive, or misleading
conduct by [defendants]." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 665 (8th
Cir. 2012). *See also Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)
(stating the elements of common-law fraud under Minnesota law).

breached those warranties by selling non-conforming goods.  This claim fails because, even assuming that these packaging representations constitute express written warranties, plaintiffs have not plausibly alleged a breach.

Plaintiffs' allegation that Champion breached the implied warranty of merchantability because its dog food does not conform to the promises or affirmations of fact made on the packaging fails for the same reason.[16]

### 2.  Unjust Enrichment

Finally, plaintiffs' unjust-enrichment claim fails both because it is premised on the same allegations of deception that the Court has found insufficient to state a claim with respect to any of plaintiffs' other causes of action, and because recovery for unjust enrichment is not available where, as here, plaintiffs have an adequate remedy at law. *See United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (explaining that unjust enrichment "is not available where there is an adequate legal remedy or where statutory standards for recovery are set by the legislature" (quoting *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992))); *Fuchs v. Menard, Inc.*, No. 17-CV-1752, 2017 WL 4339821, at *7 (N.D. Ill. Sept. 29, 2017) ("When an unjust enrichment claim is specifically premised on the allegedly fraudulent nature

---

[16]Because plaintiffs' breach-of-warranty claims must be dismissed because of the failure to plausibly allege a breach of any express or implied warranty, the Court need not reach Champion's alternative argument that plaintiffs failed to provide pre-suit notice as required by Minn. Stat. § 336.2-607(3)(a).

of a representation (as it is here), but the representation is not fraudulent, then the

unjust enrichment claim must fail too.").

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT defendants' motion to dismiss [ECF No. 32] is

GRANTED and the Second Amended Complaint is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 22, 2020                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge